IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


ROBIN D. DIETS                          )
                                        )
v.                                      )          No. 2:11-0066
                                        )
MICHAEL J. ASTRUE,                      )
        Commissioner of Social Security )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) should be denied.


## I. INTRODUCTION

On February 27, 2008, the plaintiff protectively filed an application for DIB, alleging a disability onset date of June 1, 2007, due to chronic obstructive pulmonary disease ("COPD"), chronic bronchitis, emphysema, high blood pressure, and a broken rib. (Tr. 96-98, 106-07, 125.) Her

application was denied initially and upon reconsideration. (Tr. 53-55, 60-61.) On January 19, 2010, the plaintiff amended her alleged onset date to July 8, 2007 (tr. 168), and a hearing was held before Administrative Law Judge ("ALJ") Frank Letchworth. (Tr. 25-49.) The ALJ delivered an unfavorable decision on February 25, 2010 (tr. 14-21), and the plaintiff sought review by the Appeals Council. (Tr. 8.) On May 10, 2011, the Appeal's Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on August 13, 1961, and was 45 years old as of July 8, 2007, her alleged onset date. (Tr. 96.) She has completed her GED and previously worked as a cashier and factory worker. (Tr. 30, 116-21.) The plaintiff's date last insured for DIB is September 30, 2009. (Tr. 156.)

### A. Chronological Background: Procedural Developments and Medical Records

Between December of 2004, and August of 2006, the plaintiff presented to Dr. Douglas W. Kane at Highland Rim Respiratory Specialists on eleven occasions with complaints of shortness of breath on exertion, sinus congestion, and heartburn.[1] (Tr. 484-519.) Over that time period, Dr. Kane diagnosed her with "moderate to severe obstructive pulmonary disease secondary to COPD due to

---

[1] The treatment notes from Dr. Kane's office were occasionally signed or co-signed by advanced practice registered nurses. (Tr. 466, 469, 472, 474, 476-77, 481-82, 488, 490-91, 492-93, 498, 500-01, 507-08, 510-11, 513-14.) For clarity's sake, the Court will refer to each of these notes as originating from Dr. Kane.

2

cigarette smoking," moderate COPD, chronic bronchitis, hypertension, mild rhinitis, tobacco use, and sinusitis. (Tr. 484, 488, 490, 492, 497, 500, 504, 508, 513-14, 517.)  Dr. Kane encouraged the plaintiff to quit smoking "in order to resolve her frequent COPD exacerbation" and prescribed Combivent, Albuterol, Spiriva, Proventil, Xopenex, DuoNeb, Doxycycline, Augmentin, Keflex, Prednisone, Flonase, Nasarel, and Bidex.[2]  (Tr. 490-91, 492, 497, 500, 505, 508, 510, 514.)

On September 16, 2006, the plaintiff went to the emergency room at Cookeville Regional Medical Center ("CRMC") with complaints of moderate shortness of breath. (Tr. 189-90.) An x-ray of her chest revealed "[n]o acute disease" (tr. 191), and she was diagnosed with acute asthmatic bronchitis. (Tr. 190.)  On September 25, 2006, the plaintiff returned to Dr. Kane with complaints of COPD. (Tr. 481.)  A spirometry test indicated that the plaintiff registered a forced vital capacity ("FVC") of 58.3% and a forced expiratory volume in one second ("$FEV_1$") of 38.4%, "which indicates severe obstruction."[3] *Id.*  Dr. Kane noted that the plaintiff's chronic bronchitis and sinusitis were stable. *Id.*  According to Dr. Kane, the plaintiff "continues to smoke quite heavily and this has contributed to her recurrent infections." *Id.*  He diagnosed the plaintiff with "[m]oderate to severe

---

[2] Combivent, Albuterol, Spiriva, Proventil, Xopenex, and DuoNeb are inhalation aerosols used to treat bronchospasms with COPD; Doxycycline, Augmentin, and Keflex are antibiotics; Prednisone, Flonase, and Nasarel are corticosteroid anti-inflammatories used to treat allergies; and Bidex is an expectorant.  Saunders Pharmaceutical Word Book 22, 71, 97, 178, 242, 247, 295, 388, 480, 575, 591, 657, 769 (2009) ("Saunders").

[3] FVC is the measurement of the maximum amount of air an individual is able to exhale in a single breath, and $FEV_1$ is the measurement of the amount of air an individual is able to exhale in the first second of a Pulmonary Function Test ("PFT"). Johns Hopkins Medicine, "Pulmonary Function Laboratory," at http://www.hopkinsmedicine.org/pftlab/pftests.html.

COPD with exacerbation," prescribed Prednisone, DuoNeb, Albuterol, and Zyrtec,[4] and advised her to stop smoking. (Tr. 481-82.)

On October 10, 2006, plaintiff presented to Dr. Matthew M. Bolton at Satellite Medical Center ("Satellite") with complaints of shortness of breath, coughing, drainage from her ears, and congestion. (Tr. 239-40.) He diagnosed her with minor chronic bronchitis and prescribed Prednisone and Doxycycline. (Tr. 241.) In November and December of 2006, the plaintiff returned to Satellite with complaints of coughing and congestion, and Dr. Marilyn K. Vermeesch diagnosed her with chronic bronchitis and COPD. (Tr. 247, 255.) Dr. Vermeesch prescribed Prednisone, Albuterol, DuoNeb, Ciprofloxacin, and Verelan.[5] (Tr. 248, 255.) On January 31, 2007, the plaintiff presented to Dr. James Cates at Satellite and complained that her cough was worsening. (Tr. 206-08.) He prescribed DuoNeb, Albuterol, and Verelan. (Tr. 207-08.)

Between March and August of 2007, the plaintiff presented to Dr. Bolton on several occasions with complaints of coughing, congestion, and bronchitis. (Tr. 214-16, 221-24, 233-36.) Dr. Bolton noted that the plaintiff continued to smoke, diagnosed her with COPD, and prescribed Prednisone, Advair, Benicar,[6] DuoNeb, and Proventil. *Id.* On September 22, 2007, the plaintiff presented to Dr. Vermeesch with complaints of sinus congestion and coughing, and Dr. Vermeesch noted that the plaintiff continued to smoke. (Tr. 236-37.) Dr. Vermeesch diagnosed the plaintiff with sinusitis and prescribed Verelan and Benicar. (Tr. 237-38.) The plaintiff returned to Dr. Bolton on multiple occasions between October of 2007, and May of 2008, with complaints of chest and sinus

---

[4] Zyrtec is a decongestant used to treat allergic rhinitis. Saunders at 782.

[5] Ciprofloxacin is an antibiotic, and Verelan is an antihypertensive. Saunders at 162, 751.

[6] Benicar is an antihypertensive. Saunders at 88.

congestion, chronic bronchitis, a "stuffy" nose, and coughing, and Dr. Bolton noted that she continued to smoke. (Tr. 217-20, 225-27, 243-46, 250-54, 257-61.) Dr. Bolton diagnosed the plaintiff with bronchitis and COPD and prescribed Prednisone, Proventil, Doxycycline, Ciprofloxacin, Benicar, Verelan, DuoNeb, Advair, and Chantix.[7] *Id.*

On December 23, 2007, the plaintiff presented to the emergency room at CRMC complaining that she had difficulty breathing and that her pain was a seven out of ten. (Tr. 312.) An x-ray of the plaintiff's chest revealed "[s]igns of COPD." (Tr. 318.) The plaintiff was diagnosed with pneumonia, congestive heart failure, and COPD. (Tr. 315.) On May 21, 2008, a Disability Determination Services ("DDS") PFT report showed that the plaintiff was not suffering from "any acute respiratory illness," wheezing, or broncho spasms. (Tr. 197-98.) On June 10, 2008, the plaintiff returned to Satellite with complaints of having difficulty breathing and chronic bronchitis. (Tr. 229-30.) She was given an injection of Solu-Medrol[8] and prescribed Prednisone. (Tr. 231.) In June and July of 2008, the plaintiff presented to the emergency room at CRMC with complaints of COPD, wheezing, shortness of breath, a decrease of oxygen intake, and pain that was a seven out of ten. (Tr. 295-99, 303-06.) X-rays of the plaintiff's chest showed a "[s]table exam demonstrating borderline hyperinflation and no acute process" (tr. 309) and "[n]o acute pulmonary process demonstrated." (Tr. 301.) The plaintiff was diagnosed with acute bronchitis, dyspnea,[9] and COPD and prescribed Solu-Medrol and Xopenex. (Tr. 297, 299, 304, 306.) On July 10, 2008, the plaintiff

---

[7] Chantix is a "smoking cessation aid." Saunders at 148.

[8] Solu-Medrol is a corticosteroid anti-inflammatory. Saunders at 653.

[9] Dyspnea is shortness of breath. Dorland's Illustrated Medical Dictionary 578 (30th ed. 2003).

presented to Dr. James W. Cates at Satellite with complaints of bronchitis and shortness of breath. (Tr. 331-34.) Dr. Cates noted that the plaintiff smoked and had "bilateral inspiratory wheezing." (Tr. 332.) He treated her with Ciprofloxacin and Prednisone and continued to prescribe Albuterol and Advair inhalers, Verelan, Benicar, Chantix, and also prescribed Proventil (Tr. 333.)

On July 19, 2008, Dr. James B. Millis, a nonexamining consultative DDS physician, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 285-92) and opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, that in an eight hour workday she could stand and/or walk for about six hours and sit for about six hours, and that her ability to push and/or pull was unlimited. (Tr. 286.) Dr. Millis found no postural, manipulative, visual, or communicative limitations, but found that the plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 287-89.)

On July 25, 2008, Dr. Bolton examined the plaintiff and noted that she continued to smoke. (Tr. 336.) He diagnosed her with COPD and chronic bronchitis and prescribed Prednisone and Sulfamethoxazole.[10] (Tr. 338-39.) In August of 2008, the plaintiff presented to Dr. Vermeesch with complaints of congestion, sore throat, and coughing. (Tr. 341.) Dr. Vermeesch diagnosed the plaintiff with "bronchitis, acute with bronchospasm" and "carotid bruits, bilateral;" recommended that she quit smoking; and prescribed Prednisone and Zithromax.[11] (Tr. 343-44.) An ultrasound of the plaintiff's carotid arteries revealed bilateral plaque disease with 8% stenosis on the right and 30% stenosis on the left. (Tr. 321-22.) The plaintiff presented to Dr. Kane on August 21, 2008, and related that she frequently wheezes and has a chronic cough. (Tr. 477.) A spirometry test revealed

---

[10] Sulfamethoxazole is an antibiotic. Saunders at 669.

[11] Zithromax is an antibiotic. Saunders at 778.

that she had an FVC of 66% and an $FEV_1$ of 46%, "which is improved and indicates a moderately severe obstructive ventilatory defect." *Id.* Dr. Kane diagnosed the plaintiff with moderately severe COPD that was stable, chronic bronchitis, allergic rhinitis, tobacco addiction, and an inspiratory squeak and prescribed DuoNeb, Ceftin, and theophylline.[12] *Id.*

On September 2, 2008, the plaintiff presented to Dr. Bolton with complaints of shortness of breath, and he noted that she had good air movement and moderate wheezes. (Tr. 383, 385.) He diagnosed her again with chronic bronchitis and COPD and prescribed Prednisone and Ciprofloxacin. (Tr. 385-86.) A CT scan of the plaintiff's chest revealed "some mild scattered probable chronic changes" but "[n]o significant acute or focal abnormalities." (Tr. 429.) On September 18, 2008, the plaintiff presented to Dr. Kane, and he noted that her dyspnea was "somewhat improved." (Tr. 476.) A CT scan of the plaintiff's chest revealed "acute emphysematous changes" but "no acute or focal abnormalities" such as bronchiectasis. *Id.* He diagnosed the plaintiff with moderately severe COPD with persistent bronchospasm, chronic bronchitis, tobacco addiction, and chronic respiratory squeaks; prescribed Spiriva, DuoNeb, Prednisone, and Azithromycin;[13] and recommended that the plaintiff quit smoking. *Id.* On October 7, 2008, the plaintiff presented to Dr. Vermeesch with complaints of shortness of breath and coughing, and she noted that the plaintiff continued to use tobacco. (Tr. 379-80.) Dr. Vermeesch diagnosed her with COPD and a cough and prescribed Prednisone. (Tr. 381-82.)

---

[12] Ceftin is an antibiotic, and theophylline is a bronchodilator. Saunders at 141, 697.

[13] Spiriva is prescribed for emphysema and COPD, and Azithromycin is an antibiotic. Saunders at 75, 657.

In November of 2008, the plaintiff presented to Dr. Bolton on two occasions complaining of a COPD exacerbation, shortness of breath, coughing, and having a panic attack due to dyspnea. (Tr. 371, 375.) Dr. Bolton diagnosed her with bronchitis and COPD and prescribed Prednisone and Azithromycin. (Tr. 373-74, 377-78.) In December of 2008, the plaintiff returned to Dr. Vermeesch with complaints of shortness of breath and a dry cough and reported that she was not able to quit smoking. (Tr. 366-67.) Dr. Vermeesch diagnosed her with pneumonia and a cough and prescribed Bactrim,[14] Prednisone, and Sulfamethoxazole. (Tr. 369-70.) She then presented to Rebecca E. Vaughn, a nurse practitioner at Satellite, for follow-up examinations for her pneumonia. (Tr. 358-65.) X-rays of the plaintiff's chest revealed chronic bronchitis and COPD and Ms. Vaughn prescribed Clarithromycin[15] and Prednisone. (Tr. 360, 364-65.)

On January 12, 2009, the plaintiff presented to Dr. Bolton, and he diagnosed her with COPD, chronic bronchitis, and hypertension. (Tr. 355.) Dr. Bolton prescribed Prednisone, Albuterol, Benicar, and Verelan. (Tr. 355-56.) On January 16, 2009, the plaintiff presented to Dr. Vermeesch with complaints of bronchitis. (Tr. 456-58.) Dr. Vermeesch diagnosed her with asthmatic bronchitis and prescribed Albuterol, Solu-Medrol, Atrovent, and ceftriaxone.[16] (Tr. 458-59.) Dr. Vermeesch "stressed the need" for the plaintiff to quit smoking and to use the Chantix that she had prescribed. (Tr. 458.) On January 17, 2009, the plaintiff went to the emergency room at CRMC with complaints of shortness of breath and chest pain caused by COPD. (Tr. 419-22.) An x-ray of the plaintiff's chest

[14] Bactrim is an antibacterial medication. Saunders at 78.

[15] Clarithromycin is an antibiotic. Saunders at 165.

[16] Atrovent is used to treat COPD and bronchospasms and ceftriaxone is an antibiotic. Saunders at 70, 141.

showed "underlying COPD" and "[e]vidence of past granulomatous disease with no acute cardiopulmonary disease." (Tr. 426.) The plaintiff was diagnosed with COPD. (Tr. 422.) Two days later, she returned to the emergency room at CRMC and was admitted to the hospital with complaints of shortness of breath and wheezing. (Tr. 402-406.)

On January 20, 2009, Dr. Kane examined the plaintiff in the hospital and noted that she "has significant hyperinflation and a mildly reduced diffusion capacity." (Tr. 399.) Dr. Kane relayed that, despite discussing smoking cessation "numerous times" with the plaintiff, she "continues to smoke," and he expressed pessimism that she would begin taking Chantix. *Id.* He diagnosed the plaintiff with COPD "with severe exacerbation," acute chronic bronchitis, tobacco use, and hypertension; and he noted that, during her hospitalization, she would be "treated aggressively for COPD exacerbation" and not allowed to smoke. (Tr. 401.) Dr. Kane "feared" that the plaintiff may have "interstitial disease and/or some underlying bronchiectasis;" however, he "could not verify this." (Tr. 399.) The plaintiff was discharged from CRMC on January 22, 2009, after her condition improved and she had become stable enough to be discharged. (Tr. 397.)

On January 29, 2009, the plaintiff presented to Dr. Kane and told him that "theophylline ha[d] made a significant improvement in her wheezing dyspnea." (Tr. 474.) Dr. Kane opined that the plaintiff improved with aggressive corticosteroids, beta agonists, anticholinergics, and theophylline and noted that she had a FVC of 67% and a $FEV_1$ of 48% "which is improved and indicates a moderately severe obstructive ventilatory defect." *Id.* Dr. Kane opined that the plaintiff's smoking led to her COPD exacerbations. *Id.* He diagnosed her with resolved acute COPD exacerbation, chronic bronchitis, and "tobacco habituation" and prescribed DuoNeb, theophylline, and Chantix. *Id.* On February 25, 2009, the plaintiff returned to Dr. Kane, and he reported that she

had been "working hard on smoking cessation" and was "doing fairly well," that "[t]heophylline has made significant improvement in her bronchospasm," and that "[h]er dyspnea, cough and wheezing are improved." (Tr. 472.)  A spirometry test revealed an FVC of 81% and a $FEV_1$ of 62.5%, "which is improved by 16% and indicates a moderate obstructive ventilatory defect." *Id.*  Dr. Kane diagnosed the plaintiff with "[m]oderately severe chronic obstructive pulmonary disease with significant improvement in pulmonary function, likely due to decreased tobacco habituation;" stable chronic bronchitis; "[m]ild upper respiratory viral infection versus allergic rhinitis;" and tobacco habituation.  *Id.*  He prescribed DuoNeb, Theophylline, Phenergan, and Chantix. *Id.*

On April 20, 2009, the plaintiff returned to Satellite with complaints of chest congestion and shortness of breath. (Tr. 452.)  Melissa R. Myrick, a nurse practitioner, examined the plaintiff and diagnosed her with bronchitis with acute bronchospasms and prescribed Prednisone. (Tr. 454-55.)  On May 13, 2009, the plaintiff presented to Dr. Bolton with complaints of chest congestion. (Tr. 448.)  The plaintiff relayed to him that she had cut down her smoking to 4-5 cigarettes per day while she was taking Chantix. *Id.*  He noted that she had a "mild expiratory wheeze" and "good air movement;" diagnosed her with chronic bronchitis, extrinsic asthma, and chronic COPD with acute exacerbation; and prescribed Prednisone and cefuroxime.[17] (Tr. 449-50.)  On June 2, 2009, Laura J. Lata, a registered nurse at Satellite, examined the plaintiff and noted that the plaintiff was still smoking. (Tr. 444-47.)  She diagnosed the plaintiff with COPD with acute exacerbation but found that it had "improved" and prescribed Prednisone. (Tr. 446.)

Between June and September of 2009, the plaintiff presented to Dr. Bolton on three occasions with complaints of nausea, coughing, and sinus congestion. (Tr. 432-43.)  He diagnosed

---

[17] Cefuroxime is an antibiotic. Saunders at 141.

her with expiratory wheezes, COPD, and chronic bronchitis and prescribed Prednisone and cefuroxime. (Tr. 434, 438-439, 442-43.)  On August 6, 2009, and November 9, 2009, the plaintiff presented to Dr. Kane with complaints of shortness of breath and coughing. (Tr. 466, 469.) Dr. Kane noted that the plaintiff "continues to smoke" (tr. 466) and "is smoking more than she did before." (Tr. 469.)  He explained that "[w]hen she is not smoking, her pulmonary function significantly improves." (Tr. 466.)  Spirometry tests revealed that she had a FVC of 73% and 81% and a $FEV_1$ of 47% and 60%, indicating that she had a moderate to moderately severe obstructive ventilatory defect. (Tr. 466, 469.)  Dr. Kane diagnosed the plaintiff with "moderately severe" COPD and stable chronic bronchitis, sinusitis, and tobacco habituation and prescribed DuoNeb, Spiriva, Theophylline, Prednisone, Ceftin, and Symbicort.[18] *Id.*

## B. Hearing Testimony

At the hearing, the plaintiff was represented by a non-attorney "social security consultant," and the plaintiff and Dr. Jay D. Flynn, a vocational expert ("VE"), testified. (Tr. 14, 25-49, 168.) The plaintiff testified that she has a GED, is able to drive, and has worked as a cashier at a convenience store and machine press operator.  (Tr. 29-35.)  She related that she stopped working due to shortness of breath and pain in her legs, feet, and chest.  (Tr. 36.)  The plaintiff used to smoke approximately three packs of cigarettes per day but has reduced that amount and now smokes between a pack and a pack and a half of cigarettes per day. (Tr. 37-38.)  The plaintiff explained that she tried to quit smoking by taking Chantix and Nicorette gum but that Chantix made her sick and she "didn't seem to do very well at all" while taking the Nicorette gum. (Tr. 38-39.)  The plaintiff

---

[18] Symbicort is a corticosteroidal anti-inflammatory inhaler. Saunders at 677.

admitted that since she started smoking, she had not gone more than "three or four days at home without" smoking a cigarette.  (Tr. 39.)

The plaintiff related that she is constantly "short of breath," has to stop and use her inhaler while walking around her house, and is exhausted after taking a shower. (Tr. 40-41.)  She testified that she developed breathing problems and bronchitis while working as a machine press operator. (Tr. 42.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and classified the plaintiff's past job as a cashier as light and unskilled, as a machine operator[19] as sedentary and unskilled, and as a hand packager as medium and unskilled.[20] (Tr. 45, 47.)  The ALJ asked the VE if the plaintiff could perform her past relevant work if she could do work at the light level but could have no concentrated exposure to "temperature extremes, excessive humidity levels, or pulmonary irritants." (Tr. 45.)  The VE answered that she could work as a cashier or an assembler. *Id*.  The ALJ then asked the VE whether the plaintiff could return to her past relevant work if she must avoid *all* exposure to "temperature extremes, excessive humidity, and pulmonary irritants," and the VE replied that she would be precluded from all work. (Tr. 45-46.)

Next, the ALJ asked if there would be jobs at the light level if the plaintiff "could only work in air-conditioned and heated and for lack of a better expression, 'climate-controlled facilities'" and that "climate-controlled" included exposure to "pulmonary irritants such as smoke, fumes, dust, gases, and noxious odors." (Tr. 46.)  The VE responded that the plaintiff could work in such

---

[19] The VE further classified the plaintiff's machine operator job as an "assembler." (Tr. 45.)

[20] In her work history report, the plaintiff indicated that she had previously worked as a hand packager at a warehouse (Tr. 120, 126.)

representative occupations as a silver wrapper, information clerk, or school bus monitor. *Id.* Finally, the VE testified that, if the plaintiff had to miss more than two days of work per month or if her testimony were found to be credible, she would be precluded from working. (Tr. 48.)


## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on February 25, 2010. (Tr. 14-21.) Based on the record, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2007[21] through her date last insured of September 30, 2009 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: chronic obstructive pulmonary disease and arthropathies[22] (20 CFR 404.1520(c)).

\* \* \*

---

[21] On the date of the hearing, the plaintiff amended her alleged onset date to July 8, 2007. (Tr. 168.)

[22] The ALJ did not explain which "arthropathies" are severe impairments, nor does it appear that the plaintiff ever asserted that she was disabled as a result of arthropathies, nor does the record reflect treatment for arthropathies or any form of arthritis. In his July 19, 2008 RFC assessment, Dr. Millis refers to a secondary diagnosis of arthralgias (tr. 285), and the Social Security disability determination forms include a secondary diagnosis of "[o]ther and unspecified arthropathies" (tr. 50-51); however there is no support in the record for such a diagnosis, much less for a finding that arthropathies are severe impairments for the plaintiff. In fact, any references to arthritis or arthropathies in the record indicate that the plaintiff denied such symptoms and/or that there were no findings of such a condition. (Tr. 173, 206, 240, 400, 504, 507, 510, 513.)

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

* * *

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) or to lift/carry twenty pounds occasionally and ten pounds frequently as well as sit/stand/walk six hours of an eight-hour workday. The undersigned determines that the claimant should avoid concentrated exposure to temperature extremes, excessive humidity or pulmonary irritants.

* * *

6.      Through the date last insured, the claimant was capable of performing past relevant work as a cashier and machine operator assembler. This work did not require performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

* * *

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2007, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(f)).

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity

is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v.*

*Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the

twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also*

*Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is

one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart*

*v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R.

§§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do

most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and

remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-

workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R.

§ 404.1521(b). The Commissioner is required to consider the combined effects of impairments that

individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.

§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

*denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The five step inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five step process. (Tr. 19-21.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date through her date last insured. (Tr. 16.) At step two, the ALJ determined that the plaintiff's COPD and arthropathies were severe impairments. *Id*. At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17.) At step four, the ALJ concluded that the plaintiff had the RFC to perform light work but

"should avoid concentrated exposure to temperature extremes, excessive humidity or pulmonary irritants," and thus she could perform her past relevant work as a cashier and machine operator assembler. (Tr. 17-19.)

## C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in: (1) determining that she did not meet or equal Listing 3.07(B); and (2) finding that she was "only restricted to concentrated levels of pulmonary irritants." Docket Entry No. 12, at 21-25.

### 1. The ALJ properly determined that the plaintiff did not meet or equal Listing 3.07(B).

The plaintiff contends that the ALJ erred in failing to find that she meets or equals Listing 3.07(B) for bronchiectasis. Docket Entry No. 12, at 21. In his step three analysis, the ALJ did not specifically determine whether the plaintiff's impairments satisfied Listing 3.07(B), but generally found that none of the plaintiff's impairments met or equaled a listing. The plaintiff argues that her medical records reflect numerous episodes of bronchitis sufficient to satisfy that listing. *Id.* at 22.

At step three, the burden of proof lies with the plaintiff to prove that her impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Her v. Comm'r of Soc. Sec*, 203 F.3d 388, 391 (6th Cir. 1999); *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). *See also Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). If the plaintiff's impairment does

not meet the criteria of a listing, she can present evidence that her impairment is medically equivalent to a listing. *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. Appx. 853, 854 (6th Cir. 2011); 20 C.F.R. §§ 404.1525(c)(5); 404.1526. For the plaintiff to establish medical equivalence, she "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531 (emphasis in original). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

In this case, the plaintiff asserts that she is entitled to a finding of disability under Listing 3.07(B), which provides as follows:

> 3.07 Bronchiectasis (demonstrated by appropriate imaging techniques). With:
> . . . .
> B. Episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum) or respiratory failure (documented according to 3.00C), requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for treatment counts as two episodes, and an evaluation of at least 12 consecutive months must be used to determine the frequency of episodes.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.07(B). Additionally, Section 3.00(C) explains that:

> When a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma, cystic fibrosis, bronchiectasis, or chronic asthmatic bronchitis, the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment.
> . . . .
> Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also

include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(C).

The plaintiff argues that she meets the listing due to episodes of bronchitis requiring physician intervention that occurred between August 2007 and August 2009. Docket Entry No.12, at 22. In support of her claim, the plaintiff cites twenty-six occasions during this two-year period in which she was treated for acute bronchitis.[23] Docket Entry No. 12, at 22-25.

After reviewing the record, the Court concludes that the plaintiff fails to meet the requirements of Listing 3.07(B). First, the plaintiff has never been diagnosed with bronchiectasis. Although the plaintiff has repeatedly been diagnosed with bronchitis and COPD (tr. 217, 221, 224, 227-32, 246-49, 254-55, 299, 306, 315, 338, 343, 355, 381, 385, 401, 406, 421, 446, 449, 454, 458, 466, 469, 474, 476-77, 481-82, 484-519), the record does not contain any diagnosis of bronchiectasis, much less one supported by "appropriate imaging techniques." In fact, Dr. Kane, the plaintiff's respiratory specialist, evaluated the plaintiff for bronchiectasis on September 18, 2008, and again on January 20, 2009, and found no evidence to support such a diagnosis. (Tr. 399, 476.) Because nothing in the record indicates that she has been diagnosed with bronchiectasis, the plaintiff does not satisfy the diagnostic requirements of Listing 3.07(B).

---

[23] The Commissioner contests the plaintiff's alleged twenty-six episodes, arguing that only five of the episodes required "intensive treatment" as described in Listing 3.07(B). Docket Entry No. 13, at 8-9. The Court finds it unnecessary to determine whether the plaintiff satisfied the number of episodes required by Listing 3.07(B) because, as discussed below, the plaintiff was never diagnosed with bronchiectasis and did not adhere to her prescribed treatment plan.

Second, for the plaintiff to satisfy Listing 3.07(B), the medical record must include "information documenting adherence to a prescribed regimen of treatment . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(C). As explained in section 3.00(C), "[w]hen a respiratory impairment is episodic in nature . . . the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment." *Id.* Here, the medical records reveal that the plaintiff repeatedly disregarded her doctors' orders to stop smoking and to take her prescribed smoking cessation medicine Chantix.

From as early as December 1, 2004, Dr. Kane instructed the plaintiff to quit smoking, describing tobacco cessation as a "life saving maneuver." (Tr. 517.) The plaintiff continued to express disinterest in quitting smoking, despite Dr. Kane's explanation that it would reduce the number of exacerbations of her chronic bronchitis. (Tr. 505, 508.) As plaintiff's medical records indicate, from December 1, 2004, until the plaintiff's amended onset date of July 8, 2007, she was told multiple times to quit smoking by her doctors. (Tr. 481, 484, 488, 491, 492, 497, 500, 505, 508, 511, 514, 517.) Despite these instructions and the awareness that her COPD and bronchitic exacerbations were aggravated by her tobacco habit, the plaintiff continued to smoke. (Tr. 214, 218, 222, 234, 240, 243-244, 247, 251, 254, 481, 484, 488, 490-492, 497, 500, 504, 507-508, 510-511, 513-514, 516-517.)

Between August 2007, and August 2009, the plaintiff was repeatedly instructed to quit smoking. Dr. Bolton at Satellite continued to stress the importance of tobacco cessation, but the plaintiff continued to smoke. (Tr. 244, 338, 385.) Dr. Bolton's instructions to quit smoking were echoed numerous times throughout this two-year period by Dr. Vermeesch of Satellite Medical Clinic, Dr. Mullen of the CRMC emergency room, and various other nurses. (Tr. 227, 275, 338, 343,

360, 369, 381, 385, 454.) Dr. Kane himself continued to stress the importance of tobacco cessation, noting that "we have gone over this numerous times in the office" and that he hoped that she would "be able to quit before [sh]e end[s] up on the mechanical ventilator." (Tr. 347, 397, 399.) Despite all warnings and instructions to quit, however, the plaintiff testified that, with the exception of a brief hospitalization, she continued to smoke through the date of her hearing. (Tr. 37-38.)

In an effort to help the plaintiff quit smoking, Dr. Kane initially told her about Chantix on September 25, 2006, although she declined a prescription at that time. (Tr. 481.) Dr. Bolton later prescribed Chantix on April 12, 2008 (tr. 217-219); however, the plaintiff did not immediately begin taking Chantix despite Dr. Bolton's continued instructions to do so. (Tr. 227.) Following a January 29, 2009 visit to Dr. Kane's office, the plaintiff was once again prescribed Chantix and finally agreed to start taking it, over nine months after it was initially prescribed. (Tr. 474.)

After beginning to take Chantix, the plaintiff's medical treatment became much more infrequent. In fact, the plaintiff only visited medical facilities for routine lab work from January 29, 2009, until April 20, 2009, when she visited Satellite for shortness of breath and congestion and was encouraged to "continue Chantix." (Tr. 390-395, 452.) According to a June 30, 2009 medical report from Satellite, the plaintiff stopped taking Chantix due to persistent nausea.[24] (Tr. 440.) On August 6, 2009, Dr. Kane noted that the plaintiff's "pulmonary function dropped about 20% after

---

[24] It is not clear to the Court whether the plaintiff remained on Chantix during this entire five month period. At the hearing, the plaintiff testified that she was taking Chantix for approximately "two and a half months," toward the beginning of 2009, but did not provide any dates. (Tr. 37.) An April 20, 2009 report from Satellite notes that plaintiff was "encouraged to continue Chantix and to continue smoking cessation effort," but it is not clear whether she had stopped taking it or was simply receiving encouragement to continue taking it.

she increased her tobacco [use] after stopping Chantix." (Tr. 469.) At the hearing, the plaintiff testified that she continued to smoke over a pack of cigarettes a day. (Tr. 37-38.)

The regulations require that an episodic respiratory impairment, such as the one the plaintiff alleges, be measured by the "episodes that occur despite prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 3.00(C). Moreover, if a plaintiff does not follow the prescribed treatment without a good reason, she will not be found to be disabled. 20 C.F.R. § 404.4530(b). *See also Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419, 2000 WL 1909386, at *3 (6th Cir. 2000); *Hall-Thulin v. Comm'r of Soc. Sec.*, 110 F.3d 64, 1997 WL 144237, at *1 (6th Cir. 1997) (citing *Sias v. Secretary of Health and Human Servs.,* 861 F.2d 475, 480 (6th Cir. 1988)). In this case, the record fully supports a finding that the plaintiff's bronchitis exacerbations were caused by her failure to stop smoking as recommended by her medical providers. Consequently, substantial evidence supports the ALJ's conclusion that the plaintiff "did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."[25] (Tr. 17.)

## 2. The ALJ's RFC finding was supported by substantial evidence.

The plaintiff also contends that the ALJ erred in finding that the plaintiff was only restricted to concentrated levels of pulmonary irritants. Docket Entry No. 12, at 25. She argues that the VE testified that, if she were required to avoid all exposure to *all* environmental irritants, all work would

---

[25] Although the plaintiff captions her first Statement of Error as the ALJ's error "in failing to find [the plaintiff] meets or equals Listing 3.07B" (Docket Entry No. 12, at 21), she argues only that she met the listing and does not argue that she equaled the listing. Even if the plaintiff had argued that she equaled, rather than met, Listing 3.07(B), her argument would fail because she did not follow her prescribed treatment.

be eliminated. *Id*. The plaintiff, however, offers no argument or evidence as to why the ALJ should have adopted this limitation. *Id*.

The Regulations allow the ALJ to rely on a VE at step four to determine whether a plaintiff is able to perform her past work. 20 C.F.R. § 404.1560(b)(2). The VE's testimony, in response to an ALJ's hypothetical question, will be considered substantial evidence "'only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs."). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

In his July 19, 2008 RFC assessment, Dr. Millis concluded that the plaintiff could have unlimited exposure to extreme heat, extreme cold, wetness, humidity, noise, vibration, and hazards. (Tr. 289.) He only limited the plaintiff from concentrated exposure to such pulmonary irritants as fumes, odors, dusts, gases, and poor ventilation. *Id*. Dr. Millis did not find that plaintiff should avoid all exposure to all environmental limitations; instead he concluded that the plaintiff should merely avoid *concentrated* exposure to pulmonary irritants. *Id*. The record also demonstrates that none of

the plaintiff's treating physicians limited her environmental exposure, let alone contradicted Dr. Millis' assessment.

In his findings, the ALJ was in fact more generous than necessary to the plaintiff in describing her environmental limitations. Rather than concluding that the plaintiff should only avoid concentrated exposure to pulmonary irritants, the ALJ more broadly found that she should also avoid "concentrated exposure to temperature extremes, [and] excessive humidity." (Tr. 17.)

The confusion the plaintiff demonstrates appears to be rooted in the testimony of the VE before the ALJ. In the first hypothetical posed by the ALJ, the VE testified that, if the plaintiff could not have "*concentrated* exposure to temperature extremes, excessive humidity levels, or pulmonary irritants," she would be able to perform her past relevant work as a cashier or assembler. (Tr. 45.) (Emphasis added). In the next hypothetical, the ALJ inquired whether there would be work available if the plaintiff must avoid "*all* exposure" to the aforementioned factors. *Id*. (Emphasis added). In other words, the ALJ was asking what the effect would be if the plaintiff could not have *any* exposure whatsoever. The VE testified that, if this were indeed the case, the plaintiff would be precluded from all work in all settings. *Id*. Thus, while the plaintiff would be disabled based on the facts posed in the second hypothetical, neither the ALJ nor the VE in fact concluded that it was a factually accurate representation. It was merely speculative analysis, not a fact-driven conclusion. The ALJ made it clear that his actual determination was based upon extensive objective medical evidence including medical reports from Satellite, Dr. Kane, and Dr. Millis. (Tr. 17-19.) As such, the ALJ's determination was clearly based upon substantial evidence.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 11) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge